Good morning, Your Honors. May it please the Court, Viet Nguyen for Appellant to Warden. If I may, I'd like to reserve five minutes for rebuttal. Go ahead, Counsel. The issue in this case is whether Defense Counsel Joseph Orr and his investigator, John D. Wolf, conducted a reasonable investigation into the whereabouts of the surviving victim, Arthur Ragland. From the evidence presented at the evidence hearing, there can be only one conclusion. The defense team conducted a more than reasonable investigation into Ragland's whereabouts. Orr retained the services of an experienced expert investigator. Wolf was a 27-year veteran of the LAPD who had been working as a licensed private investigator for an additional 18 years. Wolf worked with Orr on approximately 20 criminal cases, many of which were homicides. During the investigation, the petitioner told the defense team that Ragland would be a key witness. Counsel, one of the problems I'm having, given the procedural history of the case and where we are after a full-blown evidentiary hearing, is I now have a finding of fact by District Judge Phillips, I guess by the magistrate judge and adopted by Judge Phillips, that essentially the defense investigation was deficient. And I guess that's probably a mixed question of law and fact, but in this case it's very heavily driven by the facts. And don't you have to convince us that the district court basically clearly erred in its underlying findings of fact in order to permit us to overturn the grant of the writ of habeas corpus in this case? I think in this case the standard would be de novo because this is not a case. De novo? Well, de novo on the legal issue of ineffective assistance. On the basis of the factual record as found by the finder of fact after the evidentiary hearing. Yes, Your Honor. For example, let me take one of the worst pieces of evidence for you. Investigator Wolf didn't find the right Arthur Ragland, never even tried to find him, or at least was unsuccessful in efforts to find him. And had he gone to the state prison where he thought Ragland was being held, he would have learned that that wasn't the Arthur Ragland that he was looking for, in which case presumably he would have redoubled his efforts to find the real victim, Ragland. But he didn't, the district court found he didn't do any of that. I think that on this record it's just, it's not supported by the record, and it's just implausibly. What's not supported by the record? That Wolf didn't make any efforts to find Arthur Ragland. Well, the problem was he was looking for the wrong Ragland. I think that right there is, it's, he made, he found an Arthur Ragland that was in prison, the wrong Arthur Ragland, there happened to be two Arthur Raglands. Both of whom were in prison, but he was going after the wrong Ragland in the wrong jail. But it doesn't take away from the fact that he found Arthur Ragland's correct address, it's 620 West 42nd Place, and he visited that address on multiple occasions. But nobody ever talked to Arthur Ragland. That's the problem here. I'm sorry. I'm sorry. The district court basically concluded that on the basis that the prosecution never called the surviving victim of the shooting, he must have been a key witness, and that was a clue to a good defense lawyer that you better find out what Ragland has to say because there must be some reason the prosecutor didn't call him in the case in chief. But you can't know whether or not it's a good idea to call Ragland in the defense case until you find out what Ragland has to say. And they never did that. But I think here, I think the standard, especially on ineffective assistance of counsel in investigations, isn't success. Success in finding Ragland is not the standard. It's whether they took reasonable efforts to find Ragland. Which the Supreme Court has said is that the investigation must be conducted to such an extent that defense counsel can make a rational choice whether to call Ragland or not. And here, Mr. Orr couldn't know whether or not it was a good idea to call Ragland as a witness because he had no idea what Ragland was going to say. Mr. Orr couldn't know because he couldn't find him. Because he was looking for the wrong one. I mean, it's a little circular, but the bottom line is they tried and failed, and he never called his parole officer. He never used the phone number for, was it his mother or his grandmother, that was in the file. And had they done either of those, they might have been able to find the right Arthur Ragland. I think here, the fact that they found the wrong Arthur Ragland, it's kind of a red herring because besides just finding him, they didn't have any other efforts to speak to that wrong Arthur Ragland. What happened here is they found the correct Arthur Ragland's home address, and they went there on multiple occasions. Whether they thought they had the wrong Arthur Ragland while he was incarcerated, I don't think is neither here nor there. But that lead proved to be unsuccessful because according to Investigator Wolfe, nobody at that address purported to know anything about Arthur Ragland. But he also came back there later on in July and August without success. So he went there after Ragland was also released from prison, and on July 9th and also on August 19th, he went to Ragland's address, and he didn't have any success. Well, I guess what your argument is boiling down to is close enough. He tried. Yes, he failed. But we ought to conclude from the fact that his heart was in the right place, even though his investigative methods were incomplete, that that was an adequate defense investigation, which permitted Mr. Orr to determine, I'm not going to call Arthur Ragland in the defense case. I think my argument isn't that it was close enough. My argument is that he tried his best. That's what Wolfe said. He went to the correct address. He got Arthur Ragland's correct address, the address that Arthur Ragland said he lived at. He went there while he was in prison. Someone told him that he didn't live there. After he was released from prison, Mr. Wolfe went there again twice, on July 9th or on July 19th and also on August 9th without success. He found the right guy. He found the right address. He got to that doorstep, and he didn't find him. Whether he thought a different Arthur Ragland was in prison, it's neither here nor there. It didn't affect his investigation. It didn't affect the fact that he found the right Arthur Ragland's address. Well, we now know that, as a result of the evidence you're hearing, that if they had found the right Arthur Ragland, Arthur Ragland would have said, Mr. Howard was not the shooter. That's not the man who shot me. That's a pretty potent piece of exculpatory evidence for the defense. But under Strickland, there's two prongs. I have not, and I think that this Court had previously found, that if Ragland was going to testify to that, that there would be prejudice. And they're not contesting prejudice. So you're conceding that had Ragland been called as a witness at trial, there would have been prejudice? I think that this Court has already found that. I disagree, but we've already found that. Well, our panel strongly suggested that. Yeah, I think in the last trial. But I guess I want to ask the State's position now. Are you conceding, in light of the evidentiary record, which our panel did not have, that's why they remanded, that there would be prejudice under Strickland because of what Ragland said at the evidentiary hearing? I'm conceding that this Court had found that if Arthur Ragland was willing and ready to testify to what he said he did at the evidentiary hearing, and also that the district court did make that factual determination, that I don't have an argument that it's not prejudicial. So the sole issue that we must decide, in your eyes, is whether or not under prong one of Strickland, the district court legally erred in concluding on the basis of the factual record, which I don't think there's a dispute about, that the defense investigation was adequate. Correct. Let me ask you a question about that then. Because we got this case a second time, I read very carefully what the first panel said, because it seems to me I can't undo what the first panel says unless I send it on bonk. And when I read the first panel, Howard v. Clark, 608, Fed 3rd, at 571, the first panel said, Howard's attorney had a duty, at the very least, to apprise himself of Ragland's account of the shooting. That's what they said. At the very least, Howard's attorney had a duty to apprise himself of Ragland's account of the shooting, even if he would later have decided, based on information he obtained, not to put Ragland on the stand, he nonetheless had a duty to apprise himself of Ragland's account. Now, to me, that's the law of the case. I'm done. I think also, though, later, if they said that if it was Orr's or the defense counsel's shoddy investigation, Well, they did say something about shoddy investigation. But at 571, they put it right out there. Howard's attorney had a duty to apprise himself of the account of the shooting. I think that that's not the law of Strickland. I think Strickland doesn't require absolute... We're not talking about the law of Strickland. We're talking about the law of Howard v. Clark, 608, Fed 3rd. Even in Howard, which was applying Strickland, there isn't, it isn't just prejudice and whether he did or did not find Ragland. So you're saying that isn't the law of the case in that case? You're saying that isn't what they said in that case? The way I read the case is whether the shoddy investigation resulted in the defense counsel's failure to interview Ragland. Not complete success. So whether the investigation was objectively unreasonable, and that was the result of them not being able to interview and find Ragland. Okay. Can I ask, if you're a lawyer, a criminal defense lawyer, and your client comes to you, which is the record here, and Mr. Howard came to his lawyer, Mr. Orr, and said, Ragland will exonerate me. Ragland will say, or he didn't use the word exonerate, Ragland will say I didn't do it. I wasn't the shooter. You've got this really unusual situation where the two people are shot, one was killed, the survivor, the defendant says the surviving guy that somebody shot is going to say I wasn't the shooter. So take everything else aside, and even if this isn't law of the case, which it seems to be, wouldn't it be ineffective assistance of counsel for that lawyer not to refuse to go to trial until he has checked that out? What is more basic in law than that? Okay. Well, that sounds like a pretty good defense to me. Let's go check that guy out. So why are we even talking about shoddy investigation? And I think that's what the previous panel was saying. You've got to figure that out. You've got to decide whether what your client just told you is right or not. The most basic thing that any lawyer, any lawyer who was a criminal defense lawyer would do. So why are we even talking about whether that's ineffective assistance of counsel? Because the record is clear that they didn't find him. The record is clear they didn't find him, but the record is also clear that the Petitioner did not tell counsel that Ragland would exonerate him. He just told them that he would be a key witness. There's no evidence that the Petitioner told or that this man would exonerate him. And then all the evidence they had before them, the police reports, everything else, was that he told him to talk to Ragland. Yes, but he did not say he would exonerate him. There's a big difference between being a key witness. I think that was the exact quote, that Ragland would be a key witness and this man would exonerate me. That was not said. So at this point, Orr knows that Petitioner says that he'd be a key witness. Right. And he sends his investigator to find him. Do you think he's going to be a key witness against him? I mean, a key witness in his defense, obviously, I think. Right. Yes. So he sends his investigator out to find him. And he finds the right address. Is it true that your client didn't know or knew the mother's telephone number? I think that was in the police report. Is it true that your client knew the probation officer's telephone number? That's unclear. It was his probation officer before he was incarcerated the first time. He actually did sit in prison. I don't know if that would still be the same probation officer. Oh. But also, if you look at the – Probation or parole. I mean parole. I'm sorry. So he had a parole officer listed in his police report, a phone number. He did a stint in prison. It's not really clear that that would still be the same parole officer. But, I mean, presumably if he had called the former parole officer, the former parole officer could have given him the inmate locator number for the correct Arthur Ragland because that never changes, does it? No, but, again, besides finding the wrong Arthur Ragland, they didn't do anything else to touch that wrong Arthur Ragland. They actually coordinated with the prosecution to bring the correct Arthur Ragland into L.A. County for them to interview. And so whether they thought they had the right Arthur Ragland initially, they coordinated with the prosecutor to bring down the correct Arthur Ragland on July 10th for them to interview in L.A. County. He happened to use parole the day before. Okay, but my question was more basic. The confusion could have been cleared up, presumably, by calling the telephone number in the file for his, what you say, maybe former parole officer and just asking him, what's Ragland's CINI number? In this case, I don't think it was unreasonable for Orr, which he did, or it's actually Wolfe, to go to CCP Records and find a name Arthur Ragland that he thought was Arthur Ragland. And I think to the... But if he went to the parole officer, he would know that for sure, wouldn't he? Because the parole officer would say, the guy I know is Arthur Ragland is this number. And then you look up that number in the inmate locator system and it would have told him the right prison, that the correct Arthur Ragland was located. That could have been done, but I think that's hindsight. He didn't know there was going to be two Arthur Raglands and he didn't know he made a mistake. He thought he had the right Arthur Ragland. And I don't know if that's objectively unreasonable to think that there's multiple people named Arthur Ragland incarcerated in prison. Well, the district court also found that it was, I guess, evidence of deficient investigative practice not to file a motion with the superior court to ask for funds to travel out of the county to go to what was a Calipatria where the wrong Arthur Ragland was due in time. Correct, but then it was not unreasonable for Orr to rely on the prosecutor to save those funds and to bring Arthur Ragland into LA County for him to be interviewed. I thought Investigator Orr said that he didn't really trust that the prosecutor would do what the prosecutor said he was going to do. He said he didn't trust him and he's still looking for him, but it was not unreasonable for Orr to decide, because Orr made that decision. He told Wolf, wait, the prosecutor told me he'll get here on July 10th. But the investigator's testimony was I don't trust the DA. Yeah, but this is the defense team together and this is what Orr believed and Orr told Wolf, hey, hold on here, he's going to get here on July 10th and we'll interview him then. The prosecutor is an officer of the court. He filed an affidavit of attendance. In the states, he generally relied upon to bring prisoners down to coordinate with prisons for transportation causes. But the problem was that Ragland was released the day before the return date on the writ of habeas corpus at Prosequent or whatever they call it in California. Correct, but Orr didn't know it at the time. It wasn't unreasonable at that point for him to rely upon the prosecutor's affidavit of attendance and conversations with him that he'd bring him there on July 10th. Okay. Go ahead. How many days before trial did your client tell the investigator not to interview any more eyewitnesses? I think it was a week before trial. I think it happened August 21st. I think trial was actually conducted on September 3rd, but I think it was called for jury selection a little bit before that. So it was a week before trial. A week before trial when maybe I'm just a district judge from Idaho, but usually all the good stuff gets done the week before in these criminal trials. I was a little surprised that he said quit interviewing eyewitnesses when he had a week to go. That isn't the normal practice. Of course, I'm not here. I'm just in Idaho. But it seemed to me they really did big stuff in the last week. In that last week, he didn't tell the investigator to quit doing everything. He told him to focus on what we had, review the outlines, review the police report. But he said don't interview any more eyewitnesses when he already had the idea that this might be a good witness, and he didn't testify when the state was putting on the proof. He had the idea that this would be a key witness, and he also had already tried to find this witness. He got to his right address. He got on that doorstep. He was there at least twice, if not three times, and he couldn't get to him. Had the state listed Ragland as a witness that it intended to call in its case engine? No, it did not. I think in this case, I think the reason the prosecution didn't call them is Ragland's prior statement itself said that he could not identify the shooter, not that he was on the shooter. All right. Thank you very much. May it please the Court. Emily Grondyke from the Office of the Federal Public Defender on behalf of DeAndre Howard. The surviving victim of an attempted murder testified at the Federal evidentiary hearing that DeAndre Howard was not the shooter. The district court, who is the only finder of fact that's ever had the opportunity to evaluate Mr. Ragland's credibility, explicitly credited his testimony that he was available and would have been willing to assist the defense. The warden doesn't show clear error in that factual finding, and that finding fundamentally undermines the warden's argument that Ragland couldn't be found because Ragland didn't want to be found. The district court, as this Court has just recognized, made a number of findings about reasonable investigative steps that the defense never took. Now, there were months after the appointment of counsel and the investigator when Arthur Ragland was in prison and should have been easy to find. And defense counsel failed to use a date of birth in the file to verify that they found the correct person and then failed to get the necessary court order to pursue that person, which would have at least allowed defense to correct its own error. We do the – the Supreme Court has counseled that we have to evaluate counsel's efforts in light of what counsel knew, and I'd just like to clarify something in the record. The warden stated that all that Mr. Howard told his investigator was that he would be a key witness. But the investigation notes of John Wolfe, in fact, say the following. Arthur Ragland, main witness. His key witness who will testify defendant is not implicated in case. Defendant says he can beat the case with Ragland. So that's certainly among the most important information that counsel was on notice of and should have informed his investigation of Ragland. Did Orr also have at that same time the LAPD homicide reports that recounted their efforts to interview Ragland immediately after the case or the shooting? Counsel and investigator Wolfe both had the discovery materials that did include the LAPD chronological record and the statements of Mr. Ragland. And did Wolfe talk to the homicide detective who had spoken to Ragland? There's no evidence that he did, Your Honor. But he had the homicide, the murder book, right, which would have included the police report of those interviews. Yes, Your Honor. And he knew from reading those police reports that, first of all, Ragland was, I guess, pretty heavily medicated the first time they talked to him, and they didn't get much of anything useful from him. But when they talked to him the second time, the homicide detective's impression was that he was a reluctant witness who didn't want to testify against another gang member and that there was a code, I guess, among street gangs that you don't do that. Well, the LAPD report stated Detective Walters' opinion that Arthur Ragland was evasive and not cooperative. Okay. So Wolfe had that information as well as what his client or Mr. Orr's client told him. Yes, Your Honor. But in the same LAPD documents, there is the transcript of that very interview with Arthur Ragland and Detective Walters. And in that interview, Arthur Ragland provided a detailed description of the shooter, of the suspect vehicle, and of the weapon involved. So despite the LAPD's impression, based on a phone interview, that Mr. Ragland was being evasive and not cooperative,  I thought he told him on one of those interviews that he had his back turned or basically that he didn't see the shooter. He made a statement during his first interview, which was, as you noted, when he was in the hospital, shortly after he'd been removed from a medically induced coma, that the transcript is partially noted as inaudible, but it does include the phrase, wasn't looking back. The district court, however, found that that did not necessarily mean that he was not looking at the shooter. The district court also noted that Mr. Ragland made a number of incoherent and inconsistent statements during that first interview. Arthur Ragland did in his second interview, like I said, make a very detailed description of the shooter. And it's clear from the information that the defense had that at least LAPD believed he had seen the shooter because they did go back to Mr. Ragland with a photographic identification line-up. And Judge Phillips had all of that information before her at the evidentiary hearing when she found Mr. Ragland credible. Yes, Your Honor. Mr. Ragland's testimony and description at the hearing were consistent with the description that he made to police during his second interview. Let me ask you a question. It was my understanding that counsel had passed away before the evidentiary hearing before the district court. Yes, Your Honor. And that his file could not be located. That's correct as well, Your Honor. So did the State argue that there was some strategic reason not to call Ragland? No, Your Honor. My understanding in the briefing in this court, the State's never asserted that there was a strategic basis not to call Arthur Ragland. So they have stipulated there is no strategy involved. They've relied totally on whether he was adequate in his investigation. That's my understanding of the briefing before this court, Your Honor. And that was? The reason I ask is there seemed to be some thought in the district court or, excuse me, the magistrate court record about strategy. They said something about it. I just couldn't get that there was some strategy that could have been advanced. Well, the district court did observe that there's a good deal of case law, including from the Supreme Court, explaining that before trial counsel has the necessary facts, trial counsel is simply not in a position to make a strategic decision. And that's the case here. The district court did make a factual finding that there was not a strategic decision made in this case. And there are a lot of facts in the record to support that. The district court also made a number of findings about the extent of the investigation and reasonable steps that weren't taken. I'd like to note that a number of the assertions that the warden made rely on facts that are directly contrary to what the district court found. The district court found that the extent of the investigation for Mr. Ragland was questionable. Specifically, there is no evidence in the record that Mr. Wolf went to any particular address on multiple occasions. He only, during the hearing, he verified that he had gone to Mr. Ragland's address on an occasion. But we don't know more than that about the extent of it. Regarding the warden's representations about the investigation in July and August, the only evidence of any of those investigations is found in the timesheets of Mr. Wolf. And the district court explicitly rejected those timesheets as not worthy of much evidentiary weight. The district court found that the entries for July and August, like the prior entries, were meaningless, in fact. The warden hasn't shown clear error in those factual findings as well. And so those are also entitled to deference by this Court. That's because he lumped everything together, so you couldn't tell, for example, how much time he spent looking for Ragland versus other witnesses. The district court's findings about the timesheets were based on a lot of different issues. First, the majority of the purported searches for Ragland that are listed in the timesheet occurred during June of 2003. The district court observed that the defense knew that Ragland was in prison at that time, so searches for him at his home or in his neighborhood during that time just aren't credible. But there are other materials that the timesheets are also inconsistent with. For example, there's a June 26 motion for investigative fees that details all of the that it occurred to that date, and it doesn't describe any mention of searches in the neighborhood. Instead, it says that in the future, Mr. Wolff would be expected to do that kind of investigation. It's also the case that the district court looked at Mr. Wolff's contemporaneous investigation notes, which contain a detailed log of his activities on the case. And the entries in the timesheet are not corroborated by Mr. Wolff's notes of his activities. And you recognize that Wolff was working in the direction of Mr. Orr, the defense attorney. Yes, Your Honor. And, you know, I almost see the makings of a good novel here. You know, you've got just hypothetically, Howard shoots Ragland. Ragland knows he was shot by Howard. At the time, he's not about to go testify. On his behalf, somehow this gets communicated to the lawyer. The lawyer knows that. The lawyer's not pressing Wolff to work too hard to find Ragland. Not that disappointed. This isn't going to help us. Knows that. He dies. He's got cancer or something at the time, didn't he? I mean, he was sick. So then they say, oh, we're going to get convicted. Go to jail. Then Ragland comes forward, and he gives this terrific testimony. Yeah, I will testify it wasn't Howard who shot me. So then you come in. This is part of the novel. You come in here, and it all works out in your favor because you look at Wolff's shoddy investigation. And it all happened because the defense lawyer died, and now we go to a new trial, and the evidence is all different. And if that's the story, if the back story really was Howard who shot, we've got that we're letting a murderer go free. Well, Your Honor, I'd say a few things about that scenario. First, Howard has been consistent in his insistence that Ragland be interviewed from before the time of trial. He made quite a statement at his sentencing and since that time. He's been adamant that Ragland should be interviewed. Well, I'd refer Your Honor to his statement. I'm playing both of you different ways, but I don't know it was that adamant. I'd refer Your Honor to his statement at his sentencing hearing in which he said something along the lines of, I beg you, please speak to Arthur Ragland. He'll tell you it wasn't me. As God is my witness, he'll tell you it wasn't me. That's pretty adamant. I'm going to give you adamant on that one. So Mr. Howard has certainly been consistent all along that Arthur Ragland should be interviewed, and I also think that Mr. Ragland has been consistent because when he looked at the photographic six-pack, he didn't select Howard as the shooter. Did the police ask him in this interview? I don't remember seeing it. Did they ask him, did Howard shoot you? They asked him to look at a photographic six-pack. Was Howard in the six-pack? Yes, Your Honor. The district court made the finding that the photographic admonition that a witness receives when they look at such a six-pack is consistent with the idea that you're looking for the shooter and that the admonition does say the shooter may or may not be in this lineup. And Howard didn't tell Detective Walters that he recognized the picture. Ragland didn't tell Detective Walters that he recognized Howard's picture in the six-pack. No, Your Honor, he didn't. I'm going to change the question just a little bit. This is a habeas case, right? Yes, Your Honor. Habeas, we have AEDPA deference, don't we? Well, not in this case, Your Honor, because when this court previously considered this case, it already concluded that the state court's opinion was unreasonable, and so that on remand and still now, the consideration of the case will be de novo. So at that point, that court said we don't owe any more AEDPA deference to the California court, correct? Yes, Your Honor. I just wanted to make sure that I was with you on that. Thank you. The district court, as I said, made a number of findings, and I think Your Honor has made note of most of them regarding the steps of investigation that were not taken. And, you know, I think the most important ones were everything we've discussed in regards to the jail and the phone numbers that were never called. You know, knowing that a witness was key, knowing that a client was urging that witness to be interviewed, knowing that the prosecution was not going to call the surviving victim, knowing that that victim had not selected Mr. Howard from the six-pack, and knowing that the only evidence that was tying Mr. Howard to this case at all were the identifications of eyewitnesses. There was no physical evidence. There was no evidence of motive. All of those reasons would have caused a reasonable attorney to take a number of steps to find Mr. Ratland. Given your answer to my prior question, and I'm kind of using a Colombo approach here, I'm interrupting and going back to other stuff, but given your answer to my last question that our prior panel said we don't owe any deference to the California court, I'm wondering why you didn't argue to the district court and to us that the law of the case is that Howard's attorney had a duty at the very least to apprise himself of Ratland's account of the shooting, and he didn't, so case is over. Primarily because the argument that's been raised by the warden relates to the extent of the investigation, Your Honor. Well, but it didn't have anything to do with the extent. If he had a duty to apprise himself and he didn't, and we already held it. We absolutely agree, Your Honor, that counsel had more than enough reason to know that Ratland was important and that he needed the information that Ratland could provide in order to assess the state of the case. I just wondered, given your answer, I'm sorry it took me so long to follow up. Well, now you've got me thinking. So if that is the case, then do we now simply apply the normal standards of appellate review as we would have if this case were coming to us as a 2254 petition? Yes, Your Honor. We're no longer constrained by the deference involved in the ADPA. Instead, findings and facts are reviewed for clear error, and the legal conclusion about counsel's effectiveness or ineffectiveness is reviewed de novo. De novo. Okay. Yes, Your Honor. Thank you. I'd just like to note. Go right ahead. In my last 12 seconds. Go ahead. Well, you're over 12, but he's given it to you. But I'm giving everybody extra time this morning. I'm in a good mood, so go ahead. What the district court found is that the evidence and the testimony presented and the facts that it found proved what this court previously contemplated, and that was that Howard was deprived of testimony that he was not the shooter because of his counsel's shoddy investigation. In the face of credible evidence of Howard's innocence, the district court found that we cannot have confidence in this verdict. As a result of this verdict, Mr. Howard is served nine years of his two life sentences. I ask this Court to affirm the district court's grant of relief. Thank you very much, counsel. I'll give you a minute on rebuttal. I'd just like to make a couple of points, and they're factual. In the second interview with Arthur Ragland, he did give a description of the shooter, but he also said that I've got better things to do with my time than help you. I don't want to go through any more drama in my life. And also during the photo ID, Ragland was shown two photo IDs, one with a guy named Carcama, who was his friend, who he affirmatively pointed out and said, that's not the shooter. He's shown a second six-pack, which had a petitioner in it. He saw that six-pack and he said he didn't recognize anybody. And about the evidence at the before the district court. So your argument to the magistrate judge was he lied to Detective Walters when he said I don't recognize anybody in the second montage. And that's actually exactly what Detective Walters wrote down at that time. He says it appears that the defendant knows or Ragland knows the shooter and is unwilling to identify him. But that's impeachment now as to Ragland's testimony at the evidentiary hearing, and we have an express credibility finding that notwithstanding the impeachment, I believe Ragland. Yes. So we'd have to conclude it is clear error for the magistrate judge to make that finding in the face of that piece of impeachment. I'm using that as just evidence that this is just a circumstance that Orr would have known. Wolf said he knew of all these inconsistencies. Even if a petitioner had told Orr that, you know, this guy is a key witness. He's going to help me beat the case. There's all these other inconsistencies in the police reports and other things that he did that don't make him appear to be the most credible witness even at that time to Orr. And I also want to note that the district court, though it made factual findings, it simply ignored Wolf's testimony that if he had Ragland's correct address in his file, that when he was searching for Ragland, he would have visited those addresses. That's how we know on July 19th and August 9th that he went to Ragland's correct address and was unsuccessful. So he had his correct address. He went there. He testified. If he had that address in his file, he would have went there. And this is the only reasonable conclusion. Therefore, the district court's judgment granting habeas must be reversed. Because that piece of impeachment evidence renders Ragland? No, because I'm sorry. You have to convince us first that there's clear error on the facts, and then you have to convince us that if we take the facts as the district court found them as true, then it couldn't have found that there was prejudice. Well, based on the facts that Wolf found Ragland's correct address and while he was out of prison, he visited there twice without success, I think that's a more than reasonable investigation into his whereabouts. I'm sorry. I misspoke when I said prejudice. That was a reasonable investigation even though he failed. Yes. Okay. I think we understand your argument. Thank you. The case just argued is submitted, and we'll get you an answer as soon as we can.
judges: Benson, Tallman, Smith